UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

*ELECTRONICALLY FILED*

| | |
|---|---|
| NICHOLAS SANDMANN,<br><br>*Plaintiff*,<br><br>v.<br><br>GANNETT CO., INC. and GANNETT SATELLITE INFORMATION NETWORK, LLC,<br><br>*Defendants*. | No. 2:20-cv-00026-WOB-CJS<br><br>**ORAL ARGUMENT REQUESTED** |

**Defendants Gannett Co., Inc. and Gannett Satellite Information Network, LLC's Supplemental Memorandum of Law in Support of Phase I Motion for Summary Judgment**

Jon L. Fleischaker
Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
jfleischaker@kaplanjohnsonlaw.com
mabate@kaplanjohnsonlaw.com

Michael J. Grygiel (admitted *pro hac vice*)
Kelly L. McNamee (admitted *pro hac vice*)
Candra M. Connelly (*pro hac vice* application pending)
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1400
grygielm@gtlaw.com
mcnameek@gtlaw.com
connellyc@gtlaw.com

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. DISCOVERY HAS ESTABLISHED THAT THE "BLOCKING STATEMENTS" ARE NOT DEFAMATORY AS A MATTER OF LAW. ..... 3

A. Plaintiff's Deposition Testimony ..... 4

B. The Discovery Documentary Evidence ..... 6

1. Plaintiff's Contemporaneous Text Messages ..... 6

2. "Stand Your Ground" Merchandise ..... 8

3. "I Won't Back Down." ..... 9

CONCLUSION ..... 12

# TABLE OF AUTHORITIES


**Page(s)**

**Federal Cases**

*Lassiter v. Lassiter*
564 F.Supp.2d 876, 881 (E.D. Ky. 2006) (Bertlesman, J.), *aff'd* 290 F. App'x 503 (6th Cir. 2008)....2

*Roche v. Home Depot U.S.A.*,
197 F. App'x 395 (6th Cir. 2006) ....10

*Sandmann v. Gannett Co., Inc., et al.*,
No. 20-cv-0026, 2021 WL 78486 (E.D. Ky. Jan. 8, 2021)....1

*Sandmann v. WP Co. LLC*,
401 F. Supp. 3d 781 (E.D. Ky. 2019) ....12

**State Cases**

*Digest Publ'g Co. v. Perry Publ'g Co.*,
284 S.W.2d 832 (Ky. Ct. App. 1955) ....3, 10

*McCall v. Courier-Journal & Louisville Times Co.*,
623 S.W.2d 882 (Ky. 1981)....3

*Stringer v. Wal-Mart Stores, Inc.*,
151 S.W.3d 781 (Ky. 2004)....3, 11

*Taxpayers' League of Bell Cnty. v. Sun Pub. Co.*,
256 Ky. 37 (Ky. Ct. App. 1934) ....10, 11

*Toler v. Süd-Chemie, Inc.*,
458 S.W.3d 276 (Ky. 2014)....3

**Other Authorities**

U.S. CONSTITUTION amend. I ....1

FED. R. CIV. P. 56 ....1, 3

Restatement (Second) of Torts
§ 559 (AM. LAW INST. 1977)....3

Defendants Gannett Co., Inc. and Gannett Satellite Information Network, LLC ("Defendants") file this Supplemental Memorandum in support of their Phase I Motion for Summary Judgment, as permitted by the Court's Scheduling Orders. *See* Doc. 50, 58.

**INTRODUCTION**

"This is one of several defamation lawsuits filed by Nicholas Sandmann in response to publications made about events that transpired at the Lincoln Memorial in Washington D.C. on January 18, 2019." *Sandmann v. Gannett Co., Inc., et al.*, No. 2:20-cv-0026, 2021 WL 78486, at *1 (E.D. Ky. Jan. 8, 2021). As with the other cases Plaintiff has filed against media defendants, the only allegedly defamatory statements challenged in his First Amended Complaint ("FAC") concern allegations that Plaintiff "blocked" Nathan Phillips or otherwise stood in his way during their encounter at the Lincoln Memorial ("Blocking Statements").[1]

The FAC posits a narrative in which Plaintiff was victimized by Phillips through an orchestrated event intended to capture their interaction on film in order to portray Sandmann as the instigator of a racially charged confrontation. However, the evidence adduced during the initial phase of discovery establishes that the narrative Plaintiff is seeking to foist off on this Court — and the public — is a work of fiction as belied by his own deposition testimony, which establishes the following:

---

1 The instant Rule 56 motion focuses on *USA Today*'s republication of the Blocking Statements to the extent alleged in the First Amended Complaint. *See* FAC ¶¶ 230, 255, 263, 278, 291 and 303. As Defendants noted in both their Motion to Dismiss the Amended Complaint (Doc. 36, PageID.670) and Answer (Doc. 44, PageID.795), Gannett's position is that any publication of the Blocking Statements by the *Detroit Free Press*, *Nashville Tennessean*, *Cincinnati Enquirer*, and *Louisville Courier Journal* may not properly be adjudicated in this action because they are not directly owned, operated, or published by the named Defendants and, further, certain of these four community newspapers are not subject to personal jurisdiction in this Court. The Blocking Statements printed in those community newspapers are, however, materially indistinguishable from the ones printed in *USA Today*, meaning that the Court should dismiss the FAC in its entirety because the Blocking Statements are protected by the First Amendment irrespective of their publication source for the reasons set forth herein and in Defendants' Joint Memorandum of Law in Support of Motion for Summary Judgment.

- Plaintiff "put [his] foot down" and "wasn't going to move," even though he was aware other students "were stepping out of Phillips' way" (Ex. B, S.D. 176:19-20, 175:14, 180:22-25);[2]
- As a result, Plaintiff had reached "some form" of "impasse" with Phillips (*Id*., S.D. 263:7-10); and
- Plaintiff did not consider his refusal to step out of Phillips' way as disrespectful—although he acknowledged that other people might view his conduct differently (*Id*., S.D. 193:20-25; 194:1-25, 195:1-2).

Perhaps most tellingly, before he lawyered up and sanitized what had happened by filtering his public explanation of events through a prominent Kentucky PR firm, Plaintiff's text messages with CCHS friends and others in the aftermath of the incident reveal his true motivation for his face-off with Phillips—he wanted to stand up for his school because, in his mind, Phillips "was trying to intimidate us." *Id*., S.D. 174:17-18. Further, these unvarnished contemporaneous communications confirm that Plaintiff leaned into what he had done, embracing his newfound status through a willingness to exploit his commercial value as (literally) the face of the "Stand Your Ground" movement until warned off doing so by his counsel.

These facts make this the rare—if not unprecedented—defamation case where the Plaintiff's own words and actions demonstrate that *he* did not find the Blocking Statements defamatory in any way.[3] In fact, Plaintiff was proud to have "stood his ground" in front of

---

[2] Plaintiff Nicholas Sandmann's transcript of deposition testimony from September 13 and 14, 2021, is annexed as **Exhibit B** to Joint Defendant's Motion for Summary Judgment and is cited herein by page and line as "S.D. ___:___."

[3] The issue of whether the Blocking Statements are susceptible of a defamatory meaning has never been raised or decided in this case. As explained below, the discovery conducted to date establishes that the Blocking Statements are not actionable for failure to convey a defamatory meaning. *Cf. Lassiter v. Lassiter*, 564 F.Supp.2d 876, 881 (E.D. Ky. 2006) (Bertlesman, J.) (in light of trial testimony and further review of the publication, reversing determination made during pretrial proceedings and holding that "the allegations concerning adultery were statements of protected opinion under Kentucky law" (footnote omitted), *aff'd* 290 F. App'x 503 (6th Cir. 2008)).

Nathan Phillips. In the face of that undisputed evidence, it is simply not plausible for Plaintiff, through his counsel, to claim that the Blocking Statements damaged him to the tune of nearly $2 billion dollars (the combined amount he seeks from all defendants he has sued). Plaintiff cannot have it both ways—deeming his own conduct unobjectionable while claiming that Phillips' version of events as reflected in the Blocking Statements is somehow defamatory. Summary judgment for Defendants is warranted for this reason alone, in addition to the reasons laid out in Defendants' Joint Memorandum of Law in Support of Motion for Summary Judgment.[4]

## ARGUMENT

### I. DISCOVERY HAS ESTABLISHED THAT THE "BLOCKING STATEMENTS" ARE NOT DEFAMATORY AS A MATTER OF LAW.

Plaintiff has the obligation to establish that the Blocking Statements were "false and defamatory." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014). A statement is defamatory if it "'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (quoting Restatement (Second) of Torts § 559 (AM. LAW INST. 1977)).

To determine if a statement conveys a defamatory meaning, its words "must be measured by their natural and probable effect on the mind of the average lay reader and not be subjected to the critical analysis of the legal mind." *McCall v. Courier-Journal & Louisville Times Co.*, 623

[4] In discovery, Plaintiff's counsel proffered a report from a proposed expert linguistics witness who watched the video footage stipulated to by the parties—but who ignored Sandmann's deposition testimony—in attempting to satisfy Plaintiff's constitutional burden of proving the material falsity of the Blocking Statements. In the event Plaintiff relies on that report to introduce purported expert opinion testimony in the context of Phase I Rule 56 motion practice, Defendants will oppose her opinion as clearly inadmissible under both the Federal Rules of Evidence and controlling legal standards while explaining why it cannot prevent the entry of summary judgment for all of the media Defendants.

S.W.2d 882, 884 (Ky. 1981) (citing *Digest Publ'g Co. v. Perry Publ'g Co.*, 284 S.W.2d 832 (Ky. Ct. App. 1955)). Here, the evidence in the record establishes that a reasonable person would not conclude the Blocking Statements were inherently defamatory. There is no better evidence for this conclusion than the testimony of, and documents provided by, Plaintiff—speaking for himself rather than through the filter of his counsel and public relations team.

**A. <u>Plaintiff's Deposition Testimony</u>.**

First, Plaintiff's deposition testimony makes clear that he did not think there was anything wrong with standing up to what he believed to be Phillips' aggression, in order to show that he was not going to be intimidated. Indeed, Sandmann testified that he made a conscious decision to stand in front of Phillips and not move out of the way in order to show his support for his classmates and their rights:

> Q: Okay. And how did you think that standing in front of Mr. Phillips was standing up for the school?
>
> A: Because we—the students of the school had stood there long enough and taken all kinds of insults from the Hebrew Israelites, then had had the Native American—or Mr. Phillips, the Native American—walk through us or whatever. And by the time he got in my face, when he could have kept—he could have even kept going through the students if he wanted to, I figured was it time for someone to plant their foot and stand there where I had been and just face up. ***And to me, that was standing up for the school, because I wasn't going to move.***
>
> * * * * *
>
> A: As I mentioned, we—we had already taken many insults from them. And at one point, I just felt like enough is enough, we don't need to respond to them anymore with chants: ***Someone's just got to stand here, be still and put their foot down.***

Ex. B, S.D. 174:25-175:14, 176:15-20 (emphasis added).

Later, when asked whether his refusal to move out of Phillips' way was a respectful thing for a teenager to do in that situation, Sandmann pushed back. He stood firm in his view that there was nothing disrespectful about putting his foot down and planting himself in Phillips' way:

> Q: Right? So do you—even if a teenager thinks that an older person might be trying to intimidate them, you see that that person is walking forward and other people are parting for him, isn't the respectful thing to do to move out of his way as well?
>
> A: Not if he's trying to intimidate me.
>
> Q: You don't think that even if the older person—even if you think the older person is trying to intimidate you, you don't think the respectful thing to do is to just move out of the way?
>
> A: I can't see why I would. If—if they want to intimidate me, which I would assume then means they exhibit a dislike of me, I can't find any compelling reason as to why I would equally return the respect to clear a place for them to move.
>
> Q: Do you think people could disagree with you about that?
>
> A: They could.

Ex. B, S.D. 193:25-194:20.

Plaintiff expressed a similar sentiment when questioned about one of his schoolmates, who shouted "you can't move him" in a sing-song voice at Phillips after he found himself face to face with Sandmann. When asked whether that statement was disrespectful to Phillips, Plaintiff again disagreed:

> Q: Okay. And do you think that could be interpreted as mocking Mr. Phillips?
>
> A: No.
>
> Q: Why not?
>
> A: Because, I mean, that's a very neutral, truthful statement. Technically, he is not allowed to move me or put his hands on me, if you are looking at this legally. So I don't—I don't see that as how you could take that as disrespectful to Mr. Phillips.

Ex. 1 to Grygiel Decl., S.D. 320:18-321:3. In short, Plaintiff did not think his conduct in "standing his ground" in front of an elderly Native American man was in any way disrespectful, nor did he find anything wrong with his classmates informing Phillips that he could not move Sandmann out of his way. Those were just the facts, in Plaintiff's own words—nothing disrespectful.

**B. The Discovery Documentary Evidence.**

**1. Plaintiff's Contemporaneous Text Messages.**

Those statements, made under oath in September 2021, were consistent with the unfiltered perspective Plaintiff offered in real time as the social media controversy developed. On the overnight bus ride home from Washington, D.C. to Covington, Kentucky Plaintiff learned that his interaction with Phillips had gone viral. *See* Ex. 1 to Grygiel Decl., S.D. 393:6-8. By 6:00 a.m., he had reached out to two conservative activists he believed would be sympathetic to his plight: Charlie Kirk, the co-founder of Turning Point USA ("TPUSA") and Kyle Kashuv, the director of high school outreach for TPUSA. He sent nearly identical Twitter messages to both:




Ex. G, N.S. 000129 Ex. F, N.S. 001814

In revealing his motivation, these messages make clear that Sandmann was proud of the fact that he, alone among CCHS students, stood up to Phillips: "unlike others at my school I didn't step out of the way because he was trying to intimidate us." *Id.* Kashuv responded two days later, asking what he could do to help and offering to talk by phone. Ex. F, N.S. 001814. Sandmann wrote back within the hour, stating that he "need[s] to make sure my pr [public relations] person will let me speak." *Id.*

**2. "Stand Your Ground" Merchandise.**

In the days that followed, Plaintiff also wanted to authorize the commercial use of his image on "Stand Your Ground" merchandise. On February 1, 2019, Plaintiff received a text message from a former CCHS student stating: "Yo, Nick, it's Isaac Boldery. Pretty sure you know me but if not, I graduated CCH last year. I'm texting you to get permission from your parents to print a shirt that has your face on it." Ex. 2 to Grygiel Decl., N.S. 000662. At Plaintiff's request, Boldery provided a picture of what the shirt would look like; it featured a back-and-white image of Plaintiff's face, with a prominent red hat, over the phrase "STAND YOUR GROUND":




*Id.*; *see also* Ex. 3 to Grygiel Decl., N.S. 001799 (larger image of t-shirt). Plaintiff indicated that he would ask his parents and respond. Ex. 2 to Grygiel Decl., N.S. 000663.

On February 3, Boldery followed up to see if Sandmann had any update on the request. *Id.* (N.S. 000665). Plaintiff apologized for not responding because he had been busy with other activities. *Id.* On February 5, Boldery followed up again: "Hey man, any news on approval for the shirts? I know you've been busy so I just wanted to give ya some time." *Id.*, N.S. 000667. Within minutes, Plaintiff responded: "Yeah, I've been told we need to ask the lawyers on their

opinion. I wish I could just give you the go ahead!" *Id.* Later, he added: "I want to just say yes but apparently I can't." *Id.* On February 10, Boldery asked for a fourth time: "Hey were you able to ask the lawyers?" Ex. 2 to Grygiel Decl., N.S. 000671. Plaintiff responded: "Yeah, unfortunately I don't think it's a good idea. Other people printed them but they didn't ask us so idk if stuff will happen to them." *Id.* Boldery responded "Alright man thanks," and Plaintiff again apologized: "Sorry :/." *Id.*

**3. "I Won't Back Down."**

Plaintiff's embrace of his stand-your-ground hero status was not short-lived. In November 2019—a full 10 months after the incident in question—Plaintiff tweeted out "The video is really good, I liked this one better:" *See* S.D., Ex. 23.




The promoted video, available at https://www.youtube.com/watch?v=twrW4uYlN7M, is an artistically stylized two-minute clip showing Sandmann standing in front of Phillips, with a smile on his face, while the chorus of Tom Petty's famous anthem *I Won't Back Down* plays in the background. Plaintiff testified that he liked this video because it represented his desire to stand up to Phillips on behalf of his school:

Q: Did you feel like the song expressed something that spoke to you?

A: Yes, as I testified earlier about how I wanted to stand up for the school.

Q: Okay. So it's the stand—you feel like you stood your ground?

A: Yes.

Ex. 1 to Grygiel Decl., S.D. 288:23-289:4. The tweet has since been deleted from Plaintiff's Twitter feed, although Plaintiff disavows any memory of deleting it. *Id.* at 289:13.

Plaintiff's consistent statements on this score—that he stood his ground as a sign of his strength and maturity, and to show that he and his classmates could not be intimidated by Phillips—fatally undermine the FAC's allegations. Given his repeated defense of "standing his ground" in front of Phillips, Sandmann will never be able to show that the "ordinary, natural meaning" of the Blocking Statements within the "four corners" of *USA Today*'s articles, "stripped of all innuendos and explanations," *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006), could "induce an evil opinion of him in the minds of right-thinking people." *Digest Publ'g Co. v. Perry Publ'g Co.*, 284 S.W.2d at 834.

The opinion of the Kentucky Court of Appeals—then the state's highest court—in *Taxpayers' League of Bell Cnty. v. Sun Publ'g Co.,* 256 Ky. 37 (Ky. Ct. App. 1934), further undermines Plaintiff's claim that the Blocking Statements conveyed a defamatory meaning. Indeed, that opinion illustrates why the language at issue in this case could not be considered defamatory even before the constitutionalization of state libel law. In *Taxpayers' League*, a weekly newspaper published an article reporting that a government watchdog organization had "'blocked plans of Bell County to pay its debts at this time and unless some compromise is worked out a special tax levy will have to be made to take care of indebtedness.'" *Id*. at 39-40. When the Taxpayers' League alleged its portrayal as "obstructionist" was defamatory, the court had little trouble finding the statement at issue nonactionable based on its failure to convey a defamatory meaning: "Whether the plan fell through, was thwarted, hindered, delayed, *or blocked* is but a choice of words of similar import, and it cannot be conceived that the use of the unqualified word 'blocked' with reference to the plans of the court to pay debts 'at this time' is at

all reprehensible." *Id*. at 43 (emphasis added). So too, here, where giving the Blocking Statements republished by *USA Today* "the broadest latitude, [they] do[ ] not seem to be susceptible of carrying the evil meaning or purpose" attributed to them by Plaintiff. *Id*.

As the record now clarifies, there is no doubt that Plaintiff was proud to have put his foot down and stood up to Phillips. (Ex. B, S.D. 175:13-14; "And to me, that was standing up for the school, because I wasn't going to move."). Nor is there any evidence that the Blocking Statements or *USA Today*'s coverage of the incident "lower[ed Sandmann] in the estimation of the community or . . . deter[ed] third persons from associating or dealing with him." *Stringer*, 151 S.W.3d at 793. On the contrary, Plaintiff was celebrated as a hero in many quarters for standing his ground. As a result of this incident, he was invited to speak during prime time at the 2020 Republican National Convention (Ex. 1 to Grygiel Decl., S.D. 359:21-23), secured a coveted internship with Senate Majority Leader Mitch McConnell (*id*., 20:3-4, 13-23), and recently published an opinion piece in the British newspaper *The Daily Mail* encouraging Kyle Rittenhouse to sue the media just like Plaintiff himself has done.[5] Having been granted this unusually large global megaphone precisely because he "stood his ground" during the incident at the Lincoln Memorial, Plaintiff cannot claim that the Blocking Statements damaged him.

Simply put, discovery has shown that Plaintiff at all times embraced and encouraged the narrative that he stood in Phillips' way to show he and his schoolmates could not be intimidated. The Court should not allow Plaintiff to use his manufactured, after-the-fact attack on the Blocking Statements as a justification for an end-run around the Court's holding that Plaintiff

---

5 *See* Nicholas Sandmann, *The corrupt liberal media came for me, just like they came for Kyle Rittenhouse, and if he decides to sue I say go for it and hold the media accountable*, THE DAILY MAIL (Dec. 16, 2021, 1:48 PM), https://www.dailymail.co.uk/news/article-10208119/kyle-rittenhouse-trial-NICHOLAS-SANDMANN-media-defamation.html.

cannot sue media outlets seeking compensation for the way that some people treated him online. *See Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781, 794 (E.D. Ky. 2019) ("And while unfortunate, it is further irrelevant that Sandmann was scorned on social media."). Summary judgment for Defendants is warranted.

## CONCLUSION

Based on the foregoing reasons, and those in Defendants' Joint Memorandum of Law in Support of Motion for Summary Judgment, Plaintiff's defamation claims against *USA Today* should be dismissed in their entirety as a matter of law.

Dated: December 20, 2021

Respectfully submitted,

*s/ Michael P. Abate*
Jon L. Fleischaker
Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
jfleischaker@kaplanjohnsonlaw.com
mabate@kaplanjohnsonlaw.com

Michael J. Grygiel (admitted *pro hac vice*)
Kelly L. McNamee (admitted *pro hac vice*)
Candra M. Connelly (*pro hac vice* application pending)
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1400
grygielm@gtlaw.com
mcnameek@gtlaw.com
connellyc@gtlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2020, I filed the foregoing with the Court and served it upon opposing counsel by submitting it through the Court's CM/ECF system. All counsel of record are registered ECF users.

*s/ Michael P. Abate*
Counsel for Defendants